The next case, call for oral argument is People v. Steppan. Counsel, whenever you're ready. Good afternoon and may it please the court. Counsel, my name is Paul Rogers. I'm with the Office of the State Appellate Defender, and I am here on behalf of Dominic Steppan. I'm here in particular to ask this court to reverse the trial court's denial of Mr. Steppan's amended post-conviction petition following a third stage evidentiary hearing. The great weight, the manifest weight of the evidence at that evidentiary hearing was that, showed that Mr. Steppan had been denied his Sixth Amendment right to the effective assistance of counsel. Mr. Steppan made a substantial showing that he had been deprived of that, and that's why he deserves to have his attempt for a conviction reversed, and the case remanded for a new trial on that chart. This is a case basically of a trial attorney not knowing what she had, not using powerful evidence to contradict direct evidence of an element of the offense, namely the defendant's mental state, the requisite mental state of the offense. Just to flesh out that argument. You're not saying, though, that it was not proven or could not have been proven apart from her alleged error in not following up on the impeachment? No, I'm not saying that. Okay. The evidence, well, one, on the direct appeal, as this court knows, this court already found that the evidence was sufficient. In fact, and I would concede that even if this error had not occurred, the evidence could still permit a jury to find Mr. Steppan guilty of attempted murder. But the chances of a jury finding him not guilty of that charge would be greatly increased. But don't you still have to show under Strickland that there's a substantial probability or possibility that it would have been a different outcome? Yes, although not in those exact words. Strickland requires a reasonable probability, and it goes on to define what counts as a reasonable probability in terms of probability that undermines confidence in the verdict. And I've always had a preference for that formulation of it because I can understand it a little bit better. Confidence is faith, trust. Do you have faith that the verdict would be the same, that the jury would find, that a rational jury would find Mr. Steppan guilty of attempted murder, that he acted with a specific intent to kill Kevin, if the jury had known what it didn't know because Ms. Shaner failed to let them know? I hope that was clear. As this court knows, this case, the attempted murder chart stems from an incident in which Mr. Steppan fired two shots, gunshots, at a steep angle into the Hamrick residence. Most of the shots went into the second floor master bedroom, which was occupied by Kevin and his wife Connie at the time. There's no evidence, I don't think, that Mr. Steppan knew that that was the master bedroom. There was evidence that lights were on and so forth. Just to emphasize the point again, to convict Mr. Steppan of attempted murder, the state had to prove that he intended to kill Kevin. And the state's best and strongest evidence of that, of his intent, was Connie's testimony that a few hours earlier, Mr. Steppan had called the Hamrick household, spoken to Connie, and said, in effect, not in effect, said, I'm going to kill Kevin. Nobody else testified to that. Now, what trial counsel Ms. Shaner failed to do was to use evidence that she had in her possession that when Connie had spoken to the police a few hours after the incident, she had not mentioned anything at all about Mr. Steppan making the specific intent to kill him. She had a report prepared by Sergeant Deming summarizing Connie's oral statement, and she had Connie's signed written statement, neither of which mentioned that Mr. Steppan had made this threat to kill. Both of them would have been admissible to impeach Connie. The signed written statement would have been admissible as substantive evidence that, in fact, no such threat to kill had been made. Now, I think under the circumstances, this means both parts of this particular test, there was no good reason for Ms. Shaner not to make the jury aware that Connie had, in effect, contradicted herself. Connie was, for all practical purposes, the defendant's prime accuser with regard to his mental state. Certainly introducing this evidence, making the jury aware of this evidence, could not have harmed Mr. Steppan. So you don't think that it's plausible that it was good trial strategy just to point out that she may have overlooked? No, I don't think that was good trial strategy. The fact that she might not have mentioned it in the three – was it three statements she gave to the police? Well, as I understand the record, Connie spoke to the police three times or twice. She first spoke to Officer Corey. We don't have a report from Officer Corey. Then she spoke to Sergeant Deming, who wanted to clarify some things apparently that Connie had said when she spoke to Officer Corey. We have Sergeant Deming's report about Connie's oral statements to him. Then we have Connie's written statement, which came essentially contemporaneously with the report made by Sergeant Deming. This was all about 2, 2.30 in the morning. So that couldn't have been – the jury never knew that Connie had actually omitted these facts from her prior statements. Ms. Shainer went so far, but not far enough. She asked Connie whether she had told Officer Corey about the threat to kill. And Connie gave an answer that Ms. Shainer, the evidence you're hearing on the PC, admitted was an equivocation, essentially amounting to, it's possible I might not have mentioned it to Officer Corey. Now, Ms. Shainer didn't follow through by saying, well, did you mention it to any other officer? But more importantly, Ms. Shainer didn't follow through by saying, well, ask me, and you can ignore now about what you said to Sergeant Deming, that you didn't just speak to Officer Corey as far as you spoke to Sergeant Deming too, and you also didn't tell him, and by the way, is this your signature on this statement, and can you tell me anywhere in here where it says that Dominic Stepin threatened to kill Kevin? That's all it would have taken, really. It would have taken just a few questions to impeach her and to lay the foundation for admitting this as substantive evidence. In effect, what Ms. Shainer did was deprive the jury of all the relevant facts they needed to assess what really happened here and Connie's credibility. And this was not a trivial point, and I'll refer to comments made in the closing arguments to show why this was prejudicial. Part of the defense theory was that this was not an attempt at murder. This was just Dominic trying to scare the hammers. During his closing argument, and this is at page 1222 of the record, the state says, and I'm paraphrasing it. I think this is pretty close to the actual language though. We know the defendant threatened Kevin's life because of the second phone call, the second phone call being the phone call to Connie, the phone call in which Connie claimed Mr. Stepin said, I'm going to kill Kevin. At page 1226, the prosecutor says, these were not warning shots. These were shots to kill. In her closing argument, Ms. Shainer said, well, there's a difference between I'm going to kill Kevin and the other version which we got from Kevin, referring to the other phone call, I'm going to kick Kevin's ass. There's a difference between I'm going to kill you and I'm going to kick your ass. In rebuttal, the state, and this is at 1246 of the record, it's not true that there's no evidence that Mr. Stepin made a statement of intent to kill. We have Connie's testimony. This was something the state itself thought was important. In its answer to the amended post-conviction petition, the state admitted that Connie was a key witness. I already read what they said in the closing argument. I think there's a reasonable probability. I think there's enough to undermine faith in the verdict that Mr. Stepin deserves to have his amended conviction granted, and that his attempted murder conviction be reversed and his case be remanded for a new trial on that chart. Thank you, counsel. Counsel? Thank you, Your Honor. Counsel, may it please the court? Kelly Stacy on behalf of the state. This amended post-conviction petition in this case reached third stage evidentiary hearing, and when a petition reaches that stage, a reviewing court will not reverse unless it is manifestly erroneous. The defendant believes that the evidence of intent to kill basically came from Connie Hamrick and from her statement alone, but a defendant's intent may be inferred not only from statements made but from his conduct and the circumstances surrounding it. After the defendant waived his memorandum rights, he spoke to Officer Griffey, and he told Officer Griffey he would not have shot at the home if he had known there were children inside, and he raised his hands up over his head with the handcuffs on in mimicry of shooting a gun at that second-floor story. And this is consistent with the evidence in the case because there were multiple bullet holes found in that second story of the Hamrick home, along with some spent cartridges. Not only that, but the defendant's girlfriend placed him at the Sonic restaurant, which was very close to the Hamrick house, and it was right at the time of the shooting. The defendant's girlfriend, Mary Jo, stated the defendant left the vehicle for at least a brief period of time. In the opening briefs, the defendant argued trial counsel failed to use exculpatory evidence, contradicting Connie Hamrick's testimony that the defendant threatened to kill Kevin. In the reply briefs, the defendant claims the State admitted it would have been natural for Connie to have mentioned the fact that the defendant said he was going to kill Kevin. The State disagrees with the defendant's contention of that admission at the trial court level, and this was done in the answer to the post-conviction petition after the judge denied the motion to dismiss. The State actually admitted while it would have been natural for Connie to include this specific threat, it would not be unnatural to forget or neglect to include the information, especially given the gravity of what just occurred with all these bullets coming through that second floor, where both Mrs. Hamrick, Connie Hamrick, and Kevin were there. One of the bullets apparently grazed right past the ear of Connie Hamrick. So I think the evidence shows that the statement was not inconsistent with the trial testimony, but even if this court agrees with the defendant's current contention that those prior statements were somehow inconsistent with trial testimony, defense counsel did make use of the discrepancy during her cross-examination of Connie Hamrick. Defense cited the Williams case, People v. Williams. The State believes this case is not like that case at all. In Williams, trial counsel neglected to impeach a witness. The State failed to answer the defendant's motion for discovery, and the appellate court felt it was a close case. In that case, the appellate court ultimately concluded that the combined or cumulative effect of the errors supported a claim in counsel was ineffective. This case really was not close. Ms. Shader chose to use the failure to include the specific threat in the prior statement as a method to try to impeach Connie Hamrick's testimony during trial. Because this case reached the third stage of an interim hearing, trial counsel testified quite extensively about her trial strategy and tactics for the case. Ms. Shader, the trial attorney, testified, If I do not cross-examine in an appropriate way, I may actually poison the jury against my client, which I am not likely to want to do. Ms. Shader knew before going into the trial that Connie was going to testify that there was a specific threat to kill. She wasn't surprised by what occurred in the case. And the decision to cross-examine Connie in the way that Ms. Shader did was a matter of trial strategy. And because the defendant's complaint centers around trial tactics, it is purely a matter of professional judgment that cannot support a claim of ineffective assistance of counsel. Without a showing of clearly evident plain and indisputable error, the state respectfully asks you to affirm. Thank you.  Counsel? Your Honor, one of the last things that the state mentioned is that Ms. Shader admitted in an interim hearing that she was not surprised that Connie was going to testify about the threat to kill. That's exactly why Ms. Shader should have been prepared to pounce, so to speak, to cross-examine Connie about the omission from her prior statements to the police. That's what she didn't do. I believe I heard the state say that Ms. Shader did cross-examine Connie about the omission. I don't think that's accurate. I think she tried to, as I indicated in my opening remarks. I think she started down that path, but she never really got there. She left it, in her own words, Ms. Shader's own words, at an equivocation. It's possible I didn't tell the police. Well, it was more than possible. It was a fact. She didn't tell the police. Unless Sergeant Demme was going to come in and say, oh, yeah, Connie did tell me that Mr. Steppen threatened to kill Kevin, but I didn't put that in my report. That's possible. That's really about the only possibility I can think of that would keep you from using this. Again, I don't think there's any harm in showing that. So according to these two pieces of paper, police report, in your own side statement, you never mentioned this threat to kill. Now, as far as whether the evidence was close or not, I would agree that it was not close on the question of identity. But I would disagree very much that it was not close on the issue of Mr. Steppen's mental state, whether he had the specific intent to kill Kevin. This was a material omission, virtually black-letter law that you can impeach somebody with a material omission from a prior statement. The fact that it would have been natural to omit it doesn't change the fact that it would have been natural to include it, which is the basis for impeaching her with it. And again, just a reminder that this also, at least the signed statement, would have been admissible as substantive evidence. It could have been argued at the jury that way. The fact that you don't need direct evidence to prove intent, and that we rarely get direct evidence, is really a red herring. Circumstantial evidence can be very strong. In this case, the circumstantial evidence, I think, is ambiguous because what you have, and I explained in the briefs, you have somebody shooting at a very, almost 90-degree angle up in the bedroom, not stepping back to take aim, shooting up in this direction. When you have Connie testify, Kevin made an express threat to kill Kevin. That's noble for the state, and the state used it. That's almost, that's an admission. It's almost as good as a signed confession or an audio tape confession. Yeah, I was trying to kill Kevin. The circumstantial evidence here, as far as his intent is concerned, is far from overwhelming. Let's back up to the, you say he's almost shooting up vertically. Well, my understanding was, I don't know how far out in the yard he was. Was he as far, is he in the street, or what was the testimony? My understanding of the testimony, this came from the adolescents and the children who were on the first floor, that the shooter was, let's say that the bench there where your honors are sitting is the front of the house, that the shooter was closer than I am now. I want to say that one of the witnesses said it was three or four feet away. Okay, let's back up a little then. How far away was the bullet, how far away in the building was the person standing where the bullet went by closely? She was in bed. She was in bed. In bed, okay, and that's the one that went through the headboard. Yes. Yeah, but. But the odds, okay. So you're saying that it was shooting almost straight up and went through the headboard. I'm not denying that it went close to Connie. I mean, I'm trying to just make sense out of it. Right, I understand, and those are the facts. I mean, I think it's not entirely clear. Connie said she'd just gotten into bed, and then she hears a gunshot, and so I'm not exactly sure where she was when the first bullet went through. But, you know, we do know that they went through the headboard, at least some of them. And in the pillow, I thought. One, I think, wound up in a pillow, that's right. But that doesn't, that's evidence, that's circumstantial evidence of intent, but it's not nearly as conclusive evidence of intent. Well, I'm not trying to get, I'm just arguing, trying to find out where the bullet entered the house and where it went. Do you know where, did it say where it entered the home? Well, there were multiple bullets. Right, I know that. And one of them wound up in the ceiling, and I don't really remember where all, I think one of them did wind up in a pillow. Went through the headboard of the bed, so. Right. But the headboard of the bed usually stops at the level of the mattress. Did it have any evidence as to that? I don't think there was evidence as to how high it was, or even that. But if it went through the headboard, it would have been coming, it seemed to me, more. Or even that the shooter knew that there was anybody in the bed at the time the shot was fired. Yeah, it was close to the window, wasn't it, though, the bed? Yeah, Connie testified that the headboard basically, the back of the headboard. Covered part of the window, didn't it? Yeah, I don't know how close to the window it was, at least I don't remember she said that. But that's the facts of the situation. So for the reasons I stated initially, and again, I don't know about all, I'd ask the support to grant relief. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take this case under advisement. The court will be in a short recess and resume oral argument.